IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Norfolk Division

```
FILED
IN OPEN COURT

MAY  - 9 2012

CLERK, U.S. DISTRICT COURT
NORFOLK, VA
```

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 2:12cr63 |
| | ) | |
| v. | ) | |
| | ) | |
| JEREMY C. CHURCHILL, | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

The parties stipulate that the allegations in the criminal information and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt, by proof of the following facts, among others:

1.     The Bank of the Commonwealth (the "Bank"), headquartered in Norfolk, Virginia, was the sole business of Commonwealth Bankshares, Inc., whose securities were traded on the Nasdaq Stock Exchange under trading symbol "CWBS." The Bank was a financial institution with deposits insured by the Federal Deposit Insurance Corporation.

2.     Starting in September 2008, the Bank's regulators, the Federal Reserve Bank of Richmond (the "Federal Reserve") and the Virginia State Corporation Commission ("VSCC"), expressed concerns about the way the Bank managed risk and underwrote loans. In or about November 2008, the Bank sent to the Federal Reserve an application requesting approximately $28 million from the Trouble Asset Relief Program ("TARP"). Given concerns about the health of the Bank, the Federal Reserve later requested that the Bank withdraw its TARP application – which the Bank did. On or about March 19, 2010, the Federal Reserve issued a report from its September 2009 examination of the Bank that concluded the overall financial condition of the

Bank had deteriorated to an unsafe and unsound condition. The Federal Reserve noted its particular concern regarding numerous practices that management used to mask the past due status of loans, including extending new loans so that borrowers could pay on existing loans.

3.      JEREMY C. CHURCHILL was employed by the Bank as a Vice President and Commercial Loan Officer.

4.      Conspirator A was also employed by the Bank.

5.      Tivest Development & Construction, LLC ("Tivest"), headquartered in Virginia Beach, Virginia, was a residential and commercial developer.

6.      Genesis Staffing, Inc. ("Genesis Staffing"), headquartered in Chesapeake, Virginia, was an employment staffing company.

7.      Conspirator B was President of both Tivest and Genesis Staffing.

8.      In or about January 2010, Conspirator B guaranteed over $8,000,000 in loans at the Bank. Although most of these loans required interest-only payments, Conspirator B was having difficulty keeping all the loans current.

9.      On or about January 6, 2010, at Conspirator A's direction, JEREMY C. CHURCHILL prepared and submitted to the Executive Committee of the Bank's Board of Directors a commercial credit review for a $500,000 line of credit to Tivest. The commercial credit review indicated that loan proceeds would be used for pre-development costs of an office tower project in Norfolk, Virginia. The Executive Committee did not approve the loan, but instead requested additional information. Nevertheless, on or about February 12, 2010, JEREMY C. CHURCHILL and Conspirator A caused the Bank to fund a $250,000 line of credit to Tivest for the same purpose.

2



10.    On or about March 3, 2010, at Conspirator A's direction, JEREMY C. CHURCHILL presented to a differently composed Executive Committee of the Bank's Board of Directors a commercial credit review to increase the amount of this loan from $250,000 to $730,000. The commercial credit review again indicated that Tivest would use these loan proceeds for pre-development costs of an office tower project in Norfolk, Virginia. Moreover, the commercial credit review represented that Conspirator B's total exposure to the Bank was limited to approximately $8,000,000. Based on these representations, the Executive Committee approved an increase to the line of credit and the Bank funded the loan.

11.    In fact, JEREMY C. CHURCHILL knew that by that time Conspirator B guaranteed over $12,000,000 in loans at the Bank.

12.    Thereafter, Conspirator B used proceeds from this $730,000 line of credit to make interest payments on other loans at the Bank.

13.    In or about February 2010, the owners of an incomplete condominium project located at 310 24th Street in Virginia Beach, Virginia were delinquent on their loan at the Bank. Because the fair market value of the property was substantially less than the outstanding balance on the loan, the Bank would suffer a substantial loss if it foreclosed. Accordingly, on or about February 3, 2010, at Conspirator A's direction, JEREMY C. CHURCHILL prepared and submitted to the Executive Committee of the Bank's Board of Directors a commercial credit review for a $4,111,000 loan to Tivest. The commercial credit review indicated that loan proceeds would be used to purchase the property and complete construction of the condominiums. Based on these representations, the Executive Committee approved the loan.

14.    On or about March 5, 2010, JEREMY C. CHURCHILL and Conspirator A applied $2,075,000 of the proceeds to pay down the underlying loan. Thereafter, JEREMY C.

3

CHURCHILL and Conspirator A advanced an additional $2,036,000 for construction costs and interest carry – bringing the total amount of the loan to $4,111,000.

15.    From in or about March 2010 through in or about October 2010, Conspirator B submitted eight fraudulent construction draw requests to the Bank for the 24th Street condominium project. The draw requests inflated the amounts owed contractors and included costs for work that was not completed.

16.    JEREMY C. CHURCHILL and Conspirator A caused the Bank to fund all these construction draws without verifying that Tivest actually completed the work or that the costs itemized in the draw requests were accurate. Indeed, JEREMY C. CHURCHILL notified Conspirator A that the draw requests were inflated. Nonetheless, Conspirator A instructed JEREMY C. CHURCHILL to simply rely on the architectural certifications and fund the draws.

17.    Thereafter, Conspirator B used proceeds from each of these fraudulent construction draws to make interest payments on other loans at the Bank.

18.    In or about October 2010, the $4,111,000 loan was fully funded; however construction of the condominiums was only about 50 percent complete.

19.    On or about November 3, 2010, at Conspirator A's direction, JEREMY C. CHURCHILL prepared and submitted to the Executive Committee of the Bank's Board of Directors another commercial credit review requesting a $250,000 loan to Genesis Staffing. The commercial credit review indicated that Genesis Staffing would use the loan proceeds for operational costs, and that the loan was partially secured by collateral. Based on these representations, the Executive Committee approved the loan, and it was funded.

20.    In fact, JEREMY C. CHURCHILL and Conspirator A knew that the loan was essentially unsecured by collateral.



4

21.     Moreover, when the loan was funded, at the direction of Conspirator A, JEREMY C. CHURCHILL instructed Conspirator B to conceal the true nature of the transaction by transferring the loan proceeds to another financial institution before making any interest payments on other loans at the Bank.

22.     On or about November 5, 2010, Conspirator B deposited the loan proceeds into an account at Wachovia Bank. On or about November 8, 2010, Conspirator B used proceeds from this $250,000 loan to make interest payments on other loans at the Bank.

23.     Conspirator B never made a single payment on this $250,000 loan.

24.     As a result of the conspiracy, in or about April 2011, the Bank charged off the entire $250,000 loan to Genesis Staffing as a loss.

25.     As a result of the conspiracy, in or about June 2011, the Bank charged off the entire $730,000 line of credit to Tivest as a loss.

26.     As a result of the conspiracy, in or about June 2011, the Bank charged off approximately $1,321,455 of the loan for the 24th Street condominium project as a loss. The 2011 city assessed value of the 24th Street property is $620,600.

27.     On or about September 23, 2011, the State Corporation Commission closed the Bank, and the Federal Deposit Insurance Corporation placed it into receivership.

The defendant acknowledges that the foregoing statement of facts does not describe all of his conduct relating to the offenses charged in this matter.



Neil H. MacBride
United States Attorney


By:    _Katherine Lee Martin_

Katherine Lee Martin
Assistant United States Attorney
United States Attorney's Office
Main Street Centre
600 E. Main Street, Suite 1800
Richmond, Virginia 23219-2447
Phone:  (804) 819-5400
Fax:  (804) 819-7417
katherine.martin@usdoj.gov


By: _Melissa E. O'Boyle_

Melissa E. O'Boyle
Assistant United States Attorney
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510
Phone:  (757) 441-6331
Fax:  (757) 441-6689
melissa.oboyle@usdoj.gov


By:    _Uzo E. Asonye_

Uzo E. Asonye
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
Fax:    (703) 299-3980
Email: uzo.asonye@usdoj.gov


6

After consulting with my attorney, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

JEREMY C. CHURCHILL
Defendant

I am JEREMY C. CHURCHILL's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Trey R. Kelleter
Counsel for the Defendant

7